*322 Justice Kennedy
delivered the opinion of the Court, except as to Part IV.*
Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies. Facility personnel, other inmates, and the new detainee himself or herself may be in danger if these threats are introduced into the jail population. This case presents the question of what rules, or limitations, the Constitution imposes on searches of arrested persons who are to be held in jail while their cases are being processed. The term “jail” is used here in a broad sense to include prisons and other detention facilities. The specific measures being challenged will be described in more detail; but, in broad terms, the controversy concerns whether every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed.
The case turns in part on the extent to which this Court has sufficient expertise and information in the record to mandate, under the Constitution, the specific restrictions and limitations sought by those who challenge the visual search procedures at issue. In addressing this type of constitutional claim courts must defer to the judgment of cor *323 rectional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security. That necessary showing has not been made in this case.
⅜ — i
In 1998, seven years before the incidents at issue, petitioner Albert Florence was arrested after fleeing from police officers in Essex County, New Jersey. He was charged with obstruction of justice and use of a deadly weapon. Petitioner entered a plea of guilty to two lesser offenses and was sentenced to pay a fine in monthly installments. In 2003, after he fell behind on his payments and failed to appear at an enforcement hearing, a bench warrant was issued for his arrest. He paid the outstanding balance less than a week later; but, for some unexplained reason, the warrant remained in a statewide computer database.
Two years later, in Burlington County, New Jersey, petitioner and his wife were stopped in their automobile by a state trooper. Based on the outstanding warrant in the computer system, the officer arrested petitioner and took him to the Burlington County Detention Center. He was held there for six days and then was transferred to the Essex County Correctional Facility. It is not the arrest or confinement but the search process at each jail that gives rise to the claims before the Court.
Burlington County jail procedures required every arrestee to shower with a debusing agent. Officers would check ar-restees for scars, marks, gang tattoos, and contraband as they disrobed. App. to Pet. for Cert. 53a-56a. Petitioner claims he was also instructed to open his mouth, lift his tongue, hold out his arms, turn around, and lift his genitals. (It is not clear whether this last step was part of the normal practice. See ibid.) Petitioner shared a cell with at least one other person and interacted with other inmates following his admission to the jail. Tr. of Oral Arg. 17.
*324 The Essex County Correctional Facility, where petitioner was taken after six days, is the largest county jail in New Jersey. App. 70a. It admits more than 25,000 inmates each year and houses about 1,000 gang members at any given time. When petitioner was transferred there, all arriving detainees passed through a metal detector and waited in a group holding cell for a more thorough search. When they left the holding cell, they were instructed to remove their clothing while an officer looked for body markings, wounds, and contraband. Apparently without touching the detainees, an officer looked at their ears, nose, mouth, hair, scalp, fingers, hands, arms, armpits, and other body openings. Id., at 57a-59a; App. to Pet. for Cert. 137a-144a. This policy applied regardless of the circumstances of the arrest, the suspected offense, or the detainee’s behavior, demeanor, or criminal history. Petitioner alleges he was required to lift his genitals, turn around, and cough in a squatting position as part of the process. After a mandatory shower, during which his clothes were inspected, petitioner was admitted to the facility. App. 3a-4a, 52a, 258a. He was released the next day, when the charges against him were dismissed.
Petitioner sued the governmental entities that operated the jails, one of the wardens, and certain other defendants. The suit was commenced in the United States District Court for the District of New Jersey. Seeking relief under 42 U. S. C. § 1983 for violations of his Fourth and Fourteenth Amendment rights, petitioner maintained that persons arrested for a minor offense could not be required to remove their clothing and expose the most private areas of their bodies to close visual inspection as a routine part of the intake process. Rather, he contended, officials could conduct this kind of search only if they had reason to suspect a particular inmate of concealing a weapon, drugs, or other contraband. The District Court certified a class of individuals who were charged with a nonindictable offense under New Jersey law, processed at either the Burlington County or Essex County *325 jail, and directed to strip naked even though an officer had not articulated any reasonable suspicion they were concealing contraband.
After discovery, the court granted petitioner’s motion for summary judgment on the unlawful search claim. It concluded that any policy of “strip searching” nonindictable offenders without reasonable suspicion violated the Fourth Amendment. A divided panel of the United States Court of Appeals for the Third Circuit reversed, holding that the procedures described by the District Court struck a reasonable balance between inmate privacy and the security needs of the two jails. 621 F. 3d 296 (2010). The case proceeds on the understanding that the officers searched detainees prior.to their admission to the general population, as the Court of Appeals seems to have assumed. See id., at 298, 311. Petitioner has not argued this factual premise is incorrect.
The opinions in earlier proceedings, the briefs on file, and some cases of this Court refer to a “strip search.” The term is imprecise. It may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position. In the instant case, the term does not include any touching of unclothed areas by the inspecting officer. There are no allegations that the detainees here were touched in any way as part of the searches.
The Federal Courts of Appeals have come to differing conclusions as to whether the Fourth Amendment requires correctional officials to exempt some detainees who will be admitted to a jail’s general population from the searches here *326 & a> C/3 03 O) O -4-3 ⅛ O §r * C"t“ a> o CD o 3 h-; H p co . «o (D 00 ■s s
II
The difficulties of operating a detention center must not be underestimated by the courts. Turner v. Safley, 482 U. S. 78, 84-85 (1987). Jails (in the stricter sense of the term, excluding prison facilities) admit about 13 million inmates a year. See, e. g., Dept, of Justice, Bureau of Justice Statistics, T. Minton, Jail Inmates at Midyear 2010 — Statistical Tables 2 (2011). The largest facilities process hundreds of people every day; smaller jails may be crowded on weekend nights, after a large police operation, or because of detainees arriving from other jurisdictions. Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face. The Court has confirmed the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld “if it is reasonably related to legitimate penological interests.” Turner, supra, at 89; see Overton v. Bazzetta, 539 U. S. 126, 131-132 (2003). But see Johnson v. California, 543 U. S. 499, 510-511 (2005) (applying strict scrutiny to racial classifications).
The Court’s opinion in Bell v. Wolfish, 441 U. S. 520 (1979), is the starting point for understanding how this framework applies to Fourth Amendment challenges. That case addressed a rule requiring pretrial detainees in any correctional facility run by the Federal Bureau of Prisons “to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution.” Id., at 558. Inmates at the federal Metropolitan Correctional Center in New York City argued there was no security justification for these searches. Officers searched guests before they entered the visiting room, and the inmates were under constant surveillance during the visit. Id., at 577-578 (Marshall, J., dissent *327 ing). There had been but one instance in which an inmate attempted to sneak contraband back into the facility. See id., at 559 (majority opinion). The Court nonetheless upheld the search policy. It deferred to the judgment of correctional officials that the inspections served not only to discover but also to detér the smuggling of weapons, drugs, and other prohibited items inside. Id., at 558. The Court explained that there is no mechanical way to determine whether intrusions on an inmate's privacy are reasonable. Id., at 559. The need for a particular search must be balanced against the resulting invasion of personal rights. Ibid.
Policies designed to keep contraband out of jails and prisons have been upheld in cases decided since Bell. In Block v. Rutherford, 468 U. S. 576 (1984), for example, the Court concluded that the Los Angeles County Jail could ban all contact visits because of the threat they posed:
“They open the institution to the introduction of drugs, weapons, and other contraband. Visitors can easily conceal guns, knives, drugs, or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers. And these items can readily be slipped from the clothing of an innocent child, or transferred by other visitors permitted close contact with inmates.” Id., at 586.
There were “many justifications” for imposing a general ban rather than trying to carve out exceptions for certain detainees. Id., at 587. Among other problems, it would be “a difficult if not impossible task” to identify “inmates who have propensities for violence, escape, or drug smuggling.” Ibid. This was made “even more difficult by the brevity of detention and the constantly changing nature of the inmate population.” Ibid.
The Court has also recognized that deterring the possession of contraband depends in part on the ability to con *328 duct searches without predictable exceptions. In Hudson v. Palmer, 468 U. S. 517 (1984), it addressed the question whether prison officials could perform random searches of inmate lockers and cells even without reason to suspect a particular individual of concealing a prohibited item. Id., at 522-523. The Court upheld the constitutionality of the practice, recognizing that “ ‘[f]or one to advocate that prison searches must be conducted only pursuant to an enunciated general policy or when suspicion is directed at a particular inmate is to ignore the realities of prison operation.’” Id., at 529 (quoting Marrero v. Commonwealth, 222 Va. 754, 757, 284 S. E. 2d 809, 811 (1981)). Inmates would adapt to any pattern or loopholes they discovered in the search protocol and then undermine the security of the institution. 468 U. S., at 529.
These cases establish that correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities. See Bell, 441 U. S., at 546 (“Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of retained constitutional rights of both convicted prisoners and pretrial detainees”). The task of determining whether a policy is reasonably related to legitimate security interests is “peculiarly within the province and professional expertise of corrections officials.” Id., at 548. This Court has repeated the admonition that, “ ‘in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in sueh matters.’” Block, supra, at 584-585; Bell, supra, at 548.
In many jails officials seek to improve security by requiring some kind of strip search of everyone who is to be detained. These procedures have been used in different places throughout the country, from Cranston, Rhode Island, to Sapulpa, Oklahoma, to Idaho Falls, Idaho. See Roberts v. *329 Rhode Island, 239 F. 3d 107, 108-109 (CAI 2001); Chapman v. Nichols, 989 F. 2d 393, 394 (CA10 1993); Giles v. Acker-man, 746 F. 2d 614, 615 (CA9 1984) (per curiam); see also, &. g., Bull v. City and Cty. of San Francisco, 595 F. 3d 964 (CA9 2010) (en banc) (San Francisco, Cal.); Powell v. Barrett, 541 F. 3d 1298 (CA11 2008) (en banc) (Fulton Cty., Ga.); Masters v. Crouch, 872 F. 2d 1248, 1251 (CA6 1989) (Jefferson Cty., Ky.); Weber v. Dell, 804 F. 2d 796, 797-798 (CA2 1986) (Monroe Cty., N. Y.); Stewart v. Lubbock Cty., 767 F. 2d 153, 154 (CA5 1985) (Lubbock Cty., Tex.).
Persons arrested for minor offenses may be among the detainees processed at these facilities. This is, in part, a consequence of the exercise of state authority that was the subject of Atwater v. Lago Vista, 532 U. S. 318 (2001). At-water addressed the perhaps more fundamental question of who may be deprived of liberty and taken to jail in the first place. The case involved a woman who was arrested after a police officer noticed neither she nor her children were wearing their seatbelts. The arrestee argued the Fourth Amendment prohibited her custodial arrest without a warrant when an offense could not result in jail time and there was no compelling need for immediate detention. Id., at 346. The Court held that a Fourth Amendment restriction on this power would put officers in an “almost impossible spot.” Id., at 350. Their ability to arrest a suspect would depend in some cases on the precise weight of drugs in his pocket, whether he was a repeat offender, and the scope of what counted as a compelling need to detain someone. Id., at 348-349. The Court rejected the proposition that the Fourth Amendment barred custodial arrests in a set of these cases as a matter of constitutional law. It ruled, based on established principles, that officers may make an arrest based upon probable cause to believe the person has committed a criminal offense in their presence. See id., at 354. The Court stated that “a responsible Fourth Amendment balance is not well served by standards requiring sensitive, *330 case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review.” Id., at 347.
Atwater did not address whether the Constitution imposes special restrictions on the searches of offenders suspected of committing minor offenses once they are taken to jail. Some Federal Courts of Appeals have held that corrections officials may not conduct a strip search of these detainees, even if no touching is involved, absent reasonable suspicion of concealed contraband. 621 F. 3d, at 303-304, and n. 4. The Courts of Appeals to address this issue in the last decade, however, have come to the opposite conclusion. See 621 F. 3d 296 (case below); Bame v. Dillard, 637 F. 3d 380 (CADC 2011); Powell, supra; Bull, supra. The current case is set against this precedent and governed by the principles announced in Turner and Bell.
I — i 1
The question here is whether undoubted security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the more invasive search procedures at issue absent reasonable suspicion of a concealed weapon or other contraband. The Court has held that deference must be given to the officials in charge of the jail unless there is “substantial evidence” demonstrating their response to the situation is exaggerated. Block, 468 U. S., at 584-585 (internal quotation marks omitted). Petitioner has not met this standard, and the record provides full justifications for the procedures used.
A
Correctional officials have a significant interest in conducting a thorough search as a standard part of the intake process. The admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a new detainee himself or herself. The danger of introducing *331 lice or contagious infections, for example, is well documented. See, e. g., Deger & Quick, The Enduring Menace of MRSA: Incidence, Treatment, and Prevention in a County Jail, 15 J. Correctional Health Care 174, 174-175, 177-178 (2009); Bick, Infection Control in Jails and Prisons, 45 Healthcare Epidemiology 1047, 1049 (2007). The Federal Bureau of Prisons recommends that staff screen new detainees for these conditions. See Clinical Practice Guidelines, Management of Methicillin-Resistant Staphylococcus aureus (MRSA) Infections 2 (2011); Clinical Practice Guidelines, Lice and Scabies Protocol 1 (2011). Persons just arrested may have wounds or other injuries requiring immediate medical attention. It may be difficult to identify and treat these problems until detainees remove their clothes for a vis^ ual inspection. See Prison and Jail Administration: Practice and Theory 142 (P. Carlson & G. Garrett eds., 2d ed. 2008) (hereinafter Carlson & Garrett).
Jails and prisons also face grave threats posed by the increasing number of gang members who go through the intake process. See Brief for Policemen’s Benevolent Association, Local 249, et al. as Amici Curiae 14 (hereinafter PBA Brief); New Jersey Comm’n of Investigation, Gangland Behind Bars: How and Why Organized Criminal Street Gangs Thrive in New Jersey’s Prisons . . . And What Can Be Done About It 10-11 (2009). “Gang rivalries spawn a climate of tension, violence, and coercion.” Carlson & Garrett 462. The groups recruit new members by force, engage in assaults against staff, and give other inmates a reason to arm themselves. Ibid. Fights among feuding gangs can be deadly, and the officers who must maintain order are put in harm’s way. PBA Brief 17. These considerations provide a reasonable basis to justify a visual inspection for certain tattoos and other signs of gang affiliation as part of the intake process. The identification and isolation of gang members before they are admitted protects everyone in the facility. Cf. Fraise v. Terhune, 283 F. 3d 506, 509-510 (CA3 *332 2002) (Alito, J.) (describing a statewide policy authorizing the identification and isolation of gang members in prison).
Detecting contraband concealed by new detainees, furthermore, is a most serious responsibility. Weapons, drugs, and alcohol all disrupt the safe operation of a jail. Cf. Hudson, 468 U. S., at 528 (recognizing “the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband”)- Correctional officers have had to confront arrestees concealing knives, scissors, razor blades, glass shards, and other prohibited items on their person, including in their body cavities. See Bull, 595 F. 3d, at 967, 969; Brief for New Jersey County Jail Wardens Association as Amicus Curiae 17-18 (hereinafter New Jersey Wardens Brief). They have also found crack, heroin, and marijuana. Brief for City and County of San Francisco et al. as Amici Curiae 9-11 (hereinafter San Francisco Brief). The use of drugs can embolden inmates in aggression toward officers or each other; and, even apart from their use, the trade in these substances can lead to violent confrontations. See PBA Brief 11.
There are many other kinds of contraband. The textbook definition of the term covers any unauthorized item. See Prisons: Today and Tomorrow 237 (J. Pollock ed. 1997) (“Contraband is any item that is possessed in violation of prison rules. Contraband obviously includes drugs or weapons, but it can also be money, cigarettes, or even some types of clothing”). Everyday items can undermine security if introduced into a detention facility:
“Lighters and matches are fire and arson risks or potential weapons. Cell phones are used to orchestrate violence and criminality both within and without jailhouse walls. Pills and medications enhance suicide risks. Chewing gum can block locking devices; hairpins can open handcuffs; wigs can conceal drugs and weapons.” New Jersey Wardens Brief 8-9.
*333 Something as simple as an overlooked pen can pose a significant danger. Inmates commit more than 10,000 assaults on correctional staff every year and many more among themselves. See Dept, of Justice, Bureau of Justice Statistics, J. Stephan & J. Karberg, Census of State and Federal Correctional Facilities, 2000, p: v (2003).
Contraband creates additional problems because scarce items, including currency, have value in a jail’s culture and underground economy. Correctional officials inform us “[t]he competition ... for such goods begets violence, extortion, and disorder.” New Jersey Wardens Brief 2. Gangs exacerbate the problem. They “orchestrate thefts, commit assaults, and approach inmates in packs to take the contraband from the weak.” Id., at 9-10. This puts the entire facility, including detainees being held for a brief term for a minor offense, at risk. Gangs do coerce inmates who have access to the outside world, such as people serving their time on the weekends, to sneak things into the jail. Id., at 10; see, e.g., Pugmire, Vegas Suspect Has Term To Serve, Los Angeles Times, Sept. 23, 2005, p. B1 (“Weekend-only jail sentences are a common punishment for people convicted of nonviolent drug crimes ... ”). These'inmates, who might be thought to pose the least risk, have been caught smuggling prohibited items into jail. See New Jersey Wardens Brief 10. Concealing contraband often takes little time and effort. It might be done as an officer approaches a suspect’s car or during a brief commotion in a group holding cell. Something small might be tucked or taped under an armpit, behind an ear, between the buttocks, in the instep of a foot, or inside the mouth or some other body cavity.
It is not surprising that correctional officials have sought to perform thorough searches at intake for disease, gang affiliation, and contraband. Jails are often crowded, unsanitary, and dangerous places. There is a substantial interest in preventing any new inmate, either of his' own will or as a result of coercion, from putting all who live or work at these *334 institutions at even greater risk when he is admitted to the general population.
B
Petitioner acknowledges that correctional officials must be allowed to conduct an effective search during the intake process and that this will require at least some detainees to lift their genitals or cough in a squatting position. These procedures, similar to the ones upheld in Bell, are designed to uncover contraband that can go undetected by a patdown, metal detector, and other less invasive searches. See Brief for United States as Amicus Curiae 23 (hereinafter United States Brief); New Jersey Wardens Brief 19, n. 6. Petitioner maintains there is little benefit to conducting these more invasive steps on a new detainee who has not been arrested for a serious crime or for any offense involving a weapon or drugs. In his view these detainees should be exempt from this process unless they give officers a particular reason to suspect them of hiding contraband. It is reasonable, however, for correctional officials to conclude this standard would be unworkable. The record provides evidence that the seriousness of an offense is a poor predictor of who has contraband and that it would be difficult in practice to determine whether individual detainees fall within the proposed exemption.
1
People detained for minor offenses can turn out to be the most devious and dangerous criminals. Cf. Clements v. Logan, 454 U. S. 1304, 1305 (1981) (Rehnquist, J., in chambers) (deputy at a detention center shot by misdemeanant who had not been strip searched). Hours after the Oklahoma City bombing, Timothy McVeigh was stopped by a state trooper who noticed he was driving without a license plate. Johnston, Suspect Won’t Answer Any Questions, N. Y. Times, Apr. 25, 1995, p. Al. Police stopped serial killer Joel Rifkin for the same reason. McQuiston, Confes *335 sion Used To Portray Rifkin as Methodical Killer, N. Y. Times, Apr. 26, 1994, p. B6. One of the terrorists involved in the September 11 attacks was stopped and ticketed for speeding just two days before hijacking Flight 93. The Terrorists: Hijacker Got a Speeding Ticket, N. Y. Times, Jan. 8, 2002, p. A12. Reasonable correctional officials could conclude these uncertainties mean they must conduct the same thorough search of everyone who will be admitted to their facilities.
Experience shows that people arrested for minor offenses have tried to smuggle prohibited items into jail, sometimes by using their rectal cavities or genitals for the concealment. They may have some of the same incentives as a serious criminal to hide contraband. A detainee might risk carrying cash, cigarettes, or a penknife to survive in jail. Others may make a quick decision to hide unlawful substances to avoid getting in more trouble at the time of their arrest. This record has concrete examples. Officers at the Atlantic County Correctional Facility, for example, discovered that a man arrested for driving under the influence had “2 dime bags of weed, 1 pack of rolling papers, 20 matches and 5 sleeping pills” taped under his scrotum. Brief for Atlantic County et al. as Amici Curiae 36 (internal quotation marks omitted). A person booked on a misdemeanor charge of disorderly conduct in Washington State managed to hide a lighter, tobacco, tattoo needles, and other prohibited items in his rectal cavity. See United States Brief 25, n. 15. San Francisco officials have discovered contraband hidden in body cavities of people arrested for trespassing, public nuisance, and shoplifting. San Francisco Brief 3. There have been similar incidents at jails throughout the country. See United States Brief 25, n. 15.
Even if people arrested for a minor offense do not themselves wish to introduce contraband into a jail, they may be coerced into doing so by others. See New Jersey Wardens Brief 16; cf. Block, 468 U. S., at 587 (“It is not unreasonable *336 to assume, for instance, that low security risk detainees would be enlisted to help obtain contraband or weapons by their fellow inmates who are denied contact visits”). This could happen any time detainees are held in the same area, including in a van on the way to the station or in the holding cell of the jail. If, for example, a person arrested and detained for unpaid traffic citations is not subject to the same search as others, this will be well known to other detainees with jail experience. A hardened criminal or gang member can, in just a few minutes, approach the person and coerce him into hiding the fruits of a crime, a weapon, or some other contraband. As an expert in this case explained, “the interaction and mingling between misdemeanants and felons will only increase the amount of contraband in the facility if the jail can only conduct admission searches on felons.” App. 381a. Exempting people arrested for minor offenses from a standard search protocol thus may put them at greater risk and result in more contraband being brought into the detention facility. This is a substantial reason not to mandate the exception petitioner seeks as a matter of constitutional law.
2
It also may be difficult, as a practical matter, to classify inmates by their current and prior offenses before the intake search. Jails can be even more dangerous than prisons because officials there know so little about the people they admit at the outset. See New Jersey Wardens Brief 11-14.' An arrestee may be carrying a false ID or lie about his identity. The officers who conduct an initial search often do not have access to criminal history records. See, e. g., App. 235a; New Jersey Wardens Brief 13. And those records can be inaccurate or incomplete. See Department of Justice v. Reporters Comm, for Freedom of Press, 489 U. S. 749, 752 (1989). Petitioner’s rap sheet is an example. It did not reflect his previous arrest for possession of a deadly weapon. Tr. of Oral Arg. 18-19. In the absence of reliable informa *337 tion it would be illogical to require officers to assume the arrestees in front of them do not pose a risk of smuggling something into the facility.
The laborious administration of prisons would become less effective, and likely less fair and evenhanded, were the practical problems inevitable from the rules suggested by petitioner to be imposed as a constitutional mandate. Even if they had accurate information about a detainee’s current and prior arrests, officers, under petitioner’s proposed regime, would encounter serious implementation difficulties. They would be required, in a few minutes, to determine whether any of the underlying offenses were serious enough to authorize the more invasive search protocol.. Other possible classifications based on characteristics of individual detainees also might prove to be unworkable or even give rise to charges of discriminatory application. Most officers would not be well equipped to make any of these legal determinations during the pressures of the intake process. Bull, 595 F. 3d, at 985-987 (Kozinski, C. J., concurring); see also Welsh v. Wisconsin, 466 U. S. 740, 761-762 (1984) (White, J., dissenting) (“[T]he Court’s approach will necessitate a case-by-case evaluation of the seriousness of particular crimes, a difficult task for which officers and courts are poorly equipped”). To avoid liability, officers might be inclined not to conduct a thorough search in any close case, thus creating unnecessary risk for the entire jail population. Cf. Atwater, 532 U. S., at 351, and n. 22.
The Court addressed an analogous problem in Atwater. The petitioner in that case argued the Fourth Amendment prohibited a warrantless arrest when being convicted of the suspected crime “could not ultimately carry any jail time” and there was “no compelling need for immediate detention.” Id., at 346. That rule “promisefd] very little in the way of administrability.” Id., at 350. Officers could not be expected to draw the proposed lines on a moment’s notice, and. the risk of violating the Constitution would have discouraged *338 them from arresting criminals in any questionable circumstances. Id., at 350-351 (“An officer not quite sure the drugs weighed enough to warrant jail time or not quite certain about a suspect’s risk of flight would not arrest, even though it could perfectly well turn out that, in fact, the offense called for incarceration and the defendant was long gone on the day of trial”). The Fourth Amendment did not compel this result in Atwater. The Court held that officers who have probable cause to believe even a minor criminal offense has been committed in their presence may arrest the offender. See id., at 354. Individual jurisdictions can of course choose “to impose more restrictive safeguards through statutes limiting warrantless arrests for minor offenses.” Id., at 352.
One of the central principles in Atwater applies with equal force here. Officers who interact with those suspected of violating the law have an “essential interest in readily ad-ministrable rules.” Id., at 347; accord, New York v. Belton, 453 U. S. 454, 458 (1981). The officials in charge of the jails in this case urge the Court to reject any complicated constitutional scheme requiring them to conduct less thorough inspections of some detainees based on their behavior, suspected offense, criminal history, and other factors. They offer significant reasons why the Constitution must not prevent them from conducting the same search on any suspected offender who will be admitted to the general population in their facilities. The restrictions suggested by petitioner would limit the intrusion on the privacy of some detainees but at the risk of increased danger to everyone in the facility, including the less serious offenders themselves.
<1
This case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with *339 other detainees. This describes the circumstances in At-water. See 532 U. S., at 324 (“Officers took Atwater’s ‘mug shot’ and placed her, alone, in a jail cell for about one hour, after which she was taken before a magistrate and released on $310 bond”). The accommodations provided in these situations may diminish the need to conduct some aspects of the searches at issue. Cf. United States Brief 30 (discussing the segregation, and less invasive searches, of individuals held by the Federal Bureau of Prisons for misdemeanors or civil contempt). The circumstances before the Court, however, do not present the opportunity to consider a narrow exception of the sort Justice Alito describes, post, at 341-342 (concurring opinion), which might restrict whether an ar-restee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population, may be subjected to the types of searches at issue here.
Petitioner’s amici raise concerns about instances of officers engaging in intentional humiliation and other abusive practices. See Brief for Sister Bernie Galvin et al. as Amici Curiae; see also Hudson, 468 U. S., at 528 (“[Ijntentional harassment of even the most hardened criminals cannot be tolerated by a civilized society”); Bell, 441 U. S., at 560. There also may be legitimate concerns about the invasiveness of searches that involve the touching of detainees. These issues are not implicated on the facts of this case, however, and it is unnecessary to consider them here.
V
Even assuming all the facts in favor of petitioner, the search procedures at the Burlington County Detention Center and the Essex County Correctional Facility struck a reasonable balance between inmate privacy and the needs of the institutions. The Fourth and Fourteenth Amendments do not require adoption of the framework of rules petitioner proposes.
*340 The judgment of the Court of Appeals for the Third Circuit is affirmed.

It is so ordered.

 Justice Thomas joins all but Part IV of this opinion.