**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 13-7655**

---

MICHAEL CANTLEY, and; FLOYD TETER, on behalf of themselves and on behalf of a Class of others similarly situated,

Plaintiffs - Appellants,

v.

THE WEST VIRGINIA REGIONAL JAIL AND CORRECTIONAL FACILITY AUTHORITY, and; TERRY L. MILLER, both individually and in his official capacity as Executive Director of the West Virginia Regional Jail and Correctional Facility Authority and; JOSEPH A. DELONG, both individually and in his official capacity as Acting Executive Director of the West Virginia Regional Jail and Correctional Facility Authority and; LARRY PARSONS, both individually and in his official capacity as Executive Director of the West Virginia Regional Jail and Correctional Facility Authority,

Defendants - Appellees.

---

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert C. Chambers, Chief District Judge. (3:09-cv-00758)

---

Argued: September 17, 2014          Decided: November 14, 2014

---

Before WILKINSON, SHEDD, and WYNN, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Shedd and Judge Wynn joined. Judge Wynn wrote a separate concurring opinion.

---

**ARGUED:** Elmer Robert Keach, III, LAW OFFICES OF ELMER ROBERT KEACH III, PC, Amsterdam, New York, for Appellants. David J. Mincer, BAILEY & WYANT, PLLC, Charleston, West Virginia, for Appellees. **ON BRIEF:** D. Aaron Rihn, ROBERT PEIRCE & ASSOCIATES, PC, Pittsburgh, Pennsylvania; Nicholas Migliaccio, WHITFIELD, BRYSON & MASON, LLP, Washington, D.C.; Daniel Karon, GOLDMAN, SCARLATO, KARON & PENNY, PC, Cleveland, Ohio, for Appellants.

WILKINSON, Circuit Judge:

This case involves the visual strip-searching and delousing of two men held in two different jails in West Virginia. Plaintiffs Michael Cantley and Floyd Teter brought a 42 U.S.C. § 1983 action for damages and equitable relief against the West Virginia Regional Jail and Correctional Facility Authority ("WVRJA") and three former and current Executive Directors of the WVRJA. The WVRJA is the state agency tasked with overseeing the ten regional jails, each of which receives arrestees pending their arraignments when local courts are not immediately available. Plaintiffs challenge the constitutionality of the strip searches and delousing procedure.

The district court granted defendants' motion for summary judgment and denied plaintiffs' cross-motion for summary judgment on the grounds that the strip searches and delousing procedure did not violate the Fourth Amendment. Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth., 2013 WL 5531855 (S.D. W. Va. Oct. 4, 2013). We now affirm, albeit on alternate grounds with respect to plaintiff Teter. See, e.g., Ellis v. La.-Pac. Corp., 699 F.3d 778, 786 (4th Cir. 2012) ("This court is entitled to affirm the court's judgment on alternate grounds, if such grounds are apparent from the record.") (citation and internal quotation marks omitted).

Because the facts surrounding the visual strip searches of the plaintiffs are materially different, we consider them each in turn. Plaintiff Cantley was arrested in September 2008 for violating a domestic violence protection order. He was arraigned before a magistrate, who committed him to the Western Regional Jail, one of ten in the WVRJA system. Upon entering the jail, Cantley was pat-searched, given a brief medical examination, booked, and placed in a holding cell. During the booking process, Cantley cursed at the officers and threatened them. Once in the holding cell, he kicked the cell door insistently until officers put him in a restraint chair. Over the course of an hour and a half, Cantley repeatedly attempted to get out of the chair, at one point grabbing at a nurse's hand and at another threatening to strangle an officer.

After Cantley had calmed down and been released from the chair, he was strip-searched and deloused by a single male officer. The officer instructed Cantley to remove his clothes, "rais[e] his scrotum, bend[] over, and cough[]." Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth., 2013 WL 5531855, at *5 (S.D. W. Va. Oct. 4, 2013). At no point did the officer touch Cantley. The officer then used a spray bottle to apply delousing solution to Cantley's body. After showering, Cantley dressed in a prison uniform and was escorted to a holding cell, where he

4

remained until he was moved to a cell in the general housing area.[1]

The district court held that, under Florence v. Board of Chosen Freeholders of County of Burlington, 132 S. Ct. 1510 (2012), the strip search of Cantley was constitutional. Cantley, 2013 WL 5531855, at *5. In the alternative, the court held that Cantley's behavior and his arrest for violating a domestic violence protection order "justified . . . searching Mr. Cantley to ensure [the officers'] personal safety and the safety of others in the facility." Id. at *5 n.9.

In Florence, the Supreme Court held that "every detainee who will be admitted to the general population [of a jail] may be required to undergo a close visual inspection while undressed." 132 S. Ct. at 1513. Before he was strip-searched, Cantley appeared before a magistrate, who ordered him committed to the jail's general population. Florence squarely covers the strip search of Cantley. We thus affirm the district court's grant of defendants' summary judgment motion on Cantley's strip search claim on the grounds that the search was constitutional.

---

[1] Cantley also alleged that on several other occasions he was arrested and then strip-searched and deloused before presentment. The district court held that those allegations were insufficiently pled. Cantley, 2013 WL 5531855, at *4 n.4. Cantley has provided us with no reason to overturn that ruling, and we decline to do so.

II.

A.

Plaintiff Teter was arrested between 3:00 and 4:00 p.m. on February 19, 2010, for obstructing an officer and putting debris in the road. He was taken to a hospital for a medical examination, and then fingerprinted at the Preston County Courthouse. He did not appear before a magistrate. From the courthouse he was brought to the Tygart Valley Regional Jail at 10:15 p.m., where he was pat-searched, examined by a nurse, and booked. After that, Teter was escorted to a shower room, where he was strip-searched and deloused by a single male officer. The officer instructed him to remove his clothes and "spread his legs, lift his testicles, turn around, bend over, and spread his cheeks." Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth., 2013 WL 5531855, at *6 (S.D. W. Va. Oct. 4, 2013). At no point did the officer touch Teter. The officer then used a garden sprayer to apply delousing solution to the hairy areas of Teter's body.

After showering and dressing in a prison uniform, Teter was placed in a holding cell, where he was joined by another arrestee. Eventually, the two arrestees were moved to a smaller cell in expectation of the arrival of a larger group of detainees, who were to be placed in the larger holding cell. In the morning, Teter was taken out of the holding cell and

6

escorted through the general population housing unit -- where committed prisoners live -- to the video conferencing room, where he appeared before a magistrate via video connection. (Individuals arrested later in the day or in the evening often do not appear before a magistrate until the next morning.) The magistrate ordered Teter released on bond at 9:00 a.m. All told, Teter spent almost eleven hours in Tygart Valley.

The officer who strip-searched Teter testified that pat searches have turned up knives, brass knuckles, ammunition, pieces of metal, lighters, cell phones, and all types of drugs. He further testified that he has found as much contraband as the result of strip searches as from the pat searches. Strip searches have uncovered drugs, lighters, matches, and cigarettes; the contraband is sometimes taped to the arrestee's body or hidden in a balloon in the rectum.

The holding area at Tygart Valley has six cells. Because of overcrowding in the housing unit, however, officers generally only have use of two of the cells for holding pre-arraignment arrestees. As a result, officers only separate arrestees by sex instead of by seriousness of the charges. Up to fifteen individuals may be held in a single holding cell. At the time Teter was arrested, Tygart Valley conducted strip searches of every arrestee who came in, regardless of arraignment status or seriousness of the charge. After blanket strip searches were

7

suspended in 2011, there were at least two instances of drug use in the holding cells.

The district court found that the strip search of Teter "struck a reasonable balance between the need to provide safety and security at the facility and Mr. Teter's privacy interests" and thus held that the search was constitutional. Id. at *10.

B.

The doctrine of qualified immunity protects defendants in § 1983 suits from the burden of going to trial where the "conduct [at issue] does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A defendant is entitled to judgment if either "the facts . . . [do not] make out a violation of a constitutional right" or if the law was not "'clearly established' at the time of defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009). We may address either prong of this analysis first, id. at 236, and we find it unnecessary to reach the constitutional merits of the strip search of Teter.

The law is "clearly established" only if "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987))

8

(alterations omitted). We examine whether the law was clearly established as of the time the allegedly unlawful action occurred. Anderson, 483 U.S. at 640. In making our inquiry, we "'ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose.'" Lefemine v. Wideman, 672 F.3d 292, 298 (4th Cir. 2012) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 251 (1999)), vacated on other grounds, 133 S. Ct. 9 (2012). Although the law does not require that there be a prior case identical to the case at bar for the law to be clearly established, see Hope v. Pelzer, 536 U.S. 730, 741 (2002), "existing precedent must have placed the statutory or constitutional question beyond debate." Al-Kidd, 131 S. Ct. at 2083.

Plaintiff contends that Logan v. Shealy, 660 F.2d 1007 (4th Cir. 1981), clearly established that the strip search of a pre-arraignment arrestee without individualized suspicion is unconstitutional. But this case is quite different from Logan. Teter was strip-searched in a private room in the presence of one officer. Logan was strip-searched in a holding room with a transparent window; she was "exposed to the general view of persons known to be in the vicinity." Logan, 660 F.2d at 1014. The district court recognized that there were significant security justifications for searching Teter and similar

9

arrestees. Cantley, 2013 WL 5531855, at *7, *9–*10. In Logan, there was no credible justification for the strip search. Teter was strip-searched prior to being placed in a holding cell, where he might interact with up to fifteen other arrestees, and led through the housing unit to the videoconferencing room. He ultimately spent almost eleven hours in Tygart Valley. Logan, on the other hand, was strip-searched when she was soon to leave the facility, and there is no mention of her interacting with other arrestees. Logan, 660 F.2d at 1010. She spent a little more than two-and-a-half hours in total at the detention facility. Id. at 1009–10.

Logan did not clearly establish that it was unconstitutional for a correctional officer to conduct a visual strip search in a private room of an arrestee, who was to be held until the next morning in a holding cell with possibly a dozen or more other arrestees. Because the law was not clearly established, the defendants are entitled to qualified immunity for the strip search of Teter.[2]

---

[2] Because the Supreme Court issued Florence v. Board of Chosen Freeholders of County of Burlington, 132 S. Ct. 1510 (2012), after the search of Teter took place, that decision does not demonstrate either that the law was clearly established or that it was not.

III.

The district court held that the delousing of both Cantley and Teter was constitutional and granted summary judgment on the delousing claims. Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth., 2013 WL 5531855, at *13 (S.D. W. Va. Oct. 4, 2013). We affirm the grant of summary judgment, but on the grounds that it was not clearly established that the delousing policy was unconstitutional.[3]

Plaintiffs argue that Amaechi v. West, 237 F.3d 356 (4th Cir. 2001), clearly established that the delousing of both Cantley and Teter was an unreasonable search or seizure. We disagree. In Amaechi, an officer physically searched Amaechi, who had been arrested for a noise violation, in public. The male officer "squeezed her hips, and inside her opened dress, 'swiped' one ungloved hand, palm up, across her bare vagina, at which time the tip of his finger slightly penetrated Amaechi's genitals," and then "knead[ed]" her buttocks with his hand. Amaechi, 237 F.3d at 359. This sexually abusive search "took place directly in front of the Amaechis' townhouse, where the other police officers, Amaechi's husband, her five children, and

---

[3] The Supreme Court did not expressly reach the delousing issue in Florence v. Board of Chosen Freeholders of County of Burlington, simply commenting that "[t]he danger of introducing lice or contagious infections" into a detention facility "is well documented." 132 S. Ct. 1510, 1518 (2012).

11

all of her neighbors had the opportunity to observe." Id. at 360.

The delousing of Cantley and Teter, while undoubtedly unwelcome, cannot compare to the seriousness of the intrusion in Amaechi. The male officer in Amaechi manhandled the naked female plaintiff in public "without any apparent justification." Id. at 361. By contrast, the delousing of Cantley and Teter was done in a private room with only one officer, who was of the same sex, and it did not entail the officer himself touching either plaintiff. Furthermore, the jails have a significant "interest in reducing the outbreak of lice." Cantley, 2013 WL 5531885, at *12. In short, at the time of the delousing, "existing precedent [did not] place[] the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011). The defendants thus are entitled to qualified immunity for the delousing of Cantley and Teter.

IV.

In holding that the defendants' actions did not violate the Constitution and granting the defendants' motion for summary judgment, the district court necessarily denied the plaintiffs' prayer for injunctive and declaratory relief. Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth., 2013 WL 5531855, at *13 (S.D. W. Va. Oct. 4, 2013). Although we have affirmed the district court's grant of summary judgment on the alternative grounds of

qualified immunity, we conclude that injunctive and declaratory relief in this case would be premature.

A plaintiff seeking injunctive relief must satisfy these four factors: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (preliminary injunction); see eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (articulating a similar test for permanent injunctions). "[A]ll four requirements must be satisfied." Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010).

A court should not impose an injunction lightly, as it is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (citation and internal quotation marks omitted). Issuing a declaratory judgment is similarly within the court's discretion. Wilton v. Seven Falls Co., 515 U.S. 277, 286-87 (1995). It is well-settled that remedies must be tailored to violations, see, e.g. Winter, 555 U.S. at 32-33, and injunctive relief would not

13

appear an appropriate course where, as we note infra, WVRJA's policies already do not permit, absent some particularized suspicion, strip searches conducted on pre-arraignment detainees held outside the general population.

The application of equitable power is in part a pragmatic exercise as the standards set forth in Winter and eBay illustrate. Before a court uses its equitable powers to enter the field of institutional governance in this area, correctional authorities deserve the chance to absorb the implications of Florence v. Board of Chosen Freeholders of County of Burlington, 132 S. Ct. 1510 (2012), and to take steps to ensure that their policies conform to that decision. Although Florence may not have reached the precise constitutional questions presented by the case at bar, the decision altered the legal playing field for detention facilities across the nation. Specifically, taking the varying opinions in their totality, Florence made clear that blanket strip searches prior to arraignment of arrestees not designated for assignment to the detention facility's general population are constitutionally suspect in the absence of some particularized justification.

Florence did, however, note that correctional officers "must have substantial discretion to devise reasonable solutions to the problems they face." 132 S. Ct. at 1515 (detailing the different difficulties that large and small detention facilities

14

may encounter). Even before Florence came down, the WVRJA had ordered Tygart Valley to cease any blanket practice of strip-searching and delousing pre-arraignment arrestees not designated for the general jail or prison population. See J.A. 751-52 (internal Tygart Valley order); J.A. 1574 (e-mail order from WVRJA to jail administrators). The WVRJA maintains that its written policies do not allow its officers to require, without particularized suspicion, strip searches of these arrestees. While the distance between a front office directive and its implementation in the field can be a long one, we think it premature at this point to draft an equitable decree without affording some prior opportunity for West Virginia administrators to apply their own experience in complying with Florence and the shifting boundaries of the law in this area.

The searches of the type conducted here are "undoubtedly humiliating and deeply offensive to many." Florence, 132 S. Ct. at 1524 (Alito, J., concurring). At the same time, correctional authorities have an unquestionably legitimate interest in limiting the influx into their facilities of weapons and drugs, whose chief risk is to the physical safety and well-being of other arrestees themselves. Id. at 1519-20 (majority opinion). The Supreme Court has struck the balance in this difficult area by questioning whether "indiscriminate strip searching of detainees held outside of the general population" is

15

constitutional. <u>West v. Murphy</u>, No. 13-2014, slip op. at 19 (4th Cir. 2014) (Wynn, J., concurring). Conforming its policies to the directives of the Court would seem destined for high placement on any list of administrative priorities, and we trust there will be no absence of diligence in the effort.

V.

For the reasons stated, we affirm the judgment of the district court.

<u>AFFIRMED</u>

WYNN, Circuit Judge, concurring:

The majority opinion does not reach the precise question of whether the strip search conducted on Floyd Teter was unconstitutional, but it does cast serious doubt on the legality of similar searches going forward. See ante at 14. In my view, strip searching pre-arraignment detainees who are held outside the general population of a detention facility is unconstitutional absent reasonable suspicion. See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 132 S. Ct. 1510, 1523 (2012) (Roberts, C.J., concurring); id. at 1524 (Alito, J., concurring); id. at 1525 (Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, JJ., dissenting). I agree with the majority that corrections administrators would be wise to take into account recent changes in the legal landscape governing strip searches when crafting policy in this area, particularly in light of the varying opinions in Florence. See ante at 14.

17