**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-7305**

———————

EARL D. JOHNSON, JR.,

  Plaintiff - Appellant,

  v.

LT. RICHARD ROBINETTE; CHAD ZIMMERMAN, Officer,

  Defendants - Appellees.

———————

Appeal from the United States District Court for the District of Maryland, at Greenbelt. George Jarrod Hazel, District Judge. (8:17-cv-03401-GJH)

———————

Argued:  December 5, 2023                       Decided:  June 14, 2024

———————

Before NIEMEYER and WYNN, Circuit Judges, and TRAXLER, Senior Circuit Judge.

———————

Affirmed by published opinion. Senior Judge Traxler wrote the opinion in which Judge Niemeyer and Judge Wynn joined.

———————

**ARGUED:**  Cynthia Cook Robertson, PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C., for Appellant.  Robert D. Goodis, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.  **ON BRIEF:** Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

———————

TRAXLER, Senior Circuit Judge:

Plaintiff-Appellant Earl Johnson ("Johnson") is a former inmate of the Maryland Correctional Training Center ("MCTC"), a prison operated by the Maryland Department of Public Safety and Correctional Services ("DPSCS"). Johnson worked in the kitchen and states he was subjected to nine strip searches to check for contraband used to make jailhouse wine.[1] Johnson filed a complaint under 42 U.S.C. § 1983, alleging that MCTC corrections officer Chad Zimmerman ("Officer Zimmerman") sexually harassed and abused him within the meaning of the Prison Rape Elimination Act ("PREA"), 34 U.S.C. § 30301-30309, in violation of his Fourth and Eighth Amendment rights under the United States Constitution. Johnson also sued Officer Zimmerman's supervisor, Lt. Richard Robinette ("Lt. Robinette"), alleging that he is liable under supervisory and bystander theories of liability.

The district court dismissed Johnson's claims against Lt. Robinette because Johnson failed to exhaust his administrative remedies but held that Johnson's claims against Officer Zimmerman were exempt from the exhaustion requirement. The district court also granted summary judgment to Officer Zimmerman and Lt. Robinette on the merits of Johnson's claims. Johnson appeals. While we hold that the district court erred by concluding that Johnson's claims against Lt. Robinette were subject to exhaustion requirements, we nonetheless affirm the district court's decision to grant summary judgment to both defendants.

---

[1] Johnson was later transferred to Roxbury Correctional Institution in Maryland.

I.

Congress passed the PREA to, *inter alia*, "establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States" and "protect the Eighth Amendment rights of Federal, State, and local prisoners." 34 U.S.C. § 30302(1), (7).  The act defines "rape" as "the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person, forcibly or against that person's will." *Id.* § 30309(9)(A). "Sexual fondling" is defined as "the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification." *Id.* § 30309(11).

Pursuant to the Act's directive, the United States Attorney General published "national standards for the detection, prevention, reduction, and punishment of prison rape." *Id*. § 30307(a)(1).  The standards apply to adult prisons, including MCTC, and to Johnson's claims of sexual harassment and sexual abuse.  Pertinent to Johnson's allegations, "[s]exual harassment" is defined as "[r]epeated verbal comments or gestures of a sexual nature to an inmate . . . by a staff member . . . , including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures." 28 C.F.R. § 115.6.  In addition to direct forms of sexual contact and penetration, "[s]exual abuse" by a staff member includes "[a]ny other *intentional* contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is *unrelated* to official duties *or* where the staff member . . . has the intent to abuse, arouse, or gratify sexual desire." *Id.* (emphasis added).

3

Johnson initiated this lawsuit on November 13, 2017, via a *pro se* complaint against Officer Zimmerman, Lt. Robinette, and a DPSCS hearing officer who found him guilty of possessing jailhouse wine that the corrections officers found in Johnson's cell on October 3, 2017. The district court dismissed all of Johnson's claims against the hearing officer, and all of the claims against Officer Zimmerman and Lt. Robinette with the exception of Johnson's claim that they had sexually harassed and abused him. The district court appointed counsel to represent Johnson on these claims.[2]

In his Amended Complaint, Johnson alleged that Officer Zimmerman and Lt. Robinette searched his cell and conducted strip searches of his person "for alcohol or materials that could be fermented into alcohol" once a week and every week, from August 8, 2017, to October 3, 2017. J.A. 66-67. Johnson further alleged that "[d]uring each of these weekly strip searches, Officer Zimmerman sexually assaulted [him] by inappropriately and gratuitously touching [his] naked buttocks and scrotum, and by making comments of a sexual nature, including but not limited to comments regarding [his] genitalia." J.A. 67. Johnson alleged that Lt. Robinette "was aware that Officer Zimmerman [had no] justification for strip-searching" him and failed "to stop Officer Zimmerman's improper strip searches." J.A. 68.

The Prison Litigation Reform Act ("PLRA") generally requires prisoners to exhaust all "available" administrative remedies before filing an action challenging the conditions

---

[2] In a subsequent order, the district court also dismissed Johnson's official capacity claims against Officer Zimmerman and Lt. Robinette. None of these rulings are challenged on appeal.

4

of their confinement.  *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  Johnson, however, did not attempt to exhaust his sexual harassment and abuse claims pursuant to the administrative remedies procedures ("ARP") normally available for inmates to challenge the conditions of their confinement in Maryland.  He argued that he was not required to exhaust because PREA claims in Maryland are exempt from the PLRA's exhaustion requirements.  Importantly, the parties have stipulated that Johnson "seeks to redress only those claims that are exempt from the [PLRA] exhaustion requirement under applicable Maryland policies and regulations incorporating portions of the [PREA]" and that, to the extent Johnson may have originally raised additional claims that could have been "address[ed] through the ARP process, those claims were not re-raised" in the Amended Complaint.  J.A. 798.

Accordingly, Johnson was required to exhaust his PREA claims for sexual harassment and sexual abuse only if the ARP grievance procedures for such claims were available for him to exhaust.  *See Ross v. Blake*, 578 U.S. 632, 636 (2016) ("A prisoner need not exhaust remedies if they are not 'available.'"); *Younger v. Crowder*, 79 F.4th 373, 379 (4th Cir. 2023) (same).

Among its many requirements, the PREA standards require prisons to comply with "a variety of . . . provisions aimed at ensuring that [the prison's] grievance procedures that cover sexual abuse provide inmates with a full and fair opportunity to preserve their ability to seek judicial review, without imposing undue burdens on agencies or facilities."  77 Fed.

5

Reg. 37106-01, *37109 (June 20, 2012).  For example, the "administrative remedies" standard dictates that a prison "shall not impose a time limit on when an inmate may submit a grievance regarding an allegation of sexual abuse," 28 C.F.R. § 115.52(b)(1), or "require an inmate to use any informal grievance process, or to otherwise attempt to resolve with staff, an alleged incident of sexual abuse," *id.* § 115.52(b)(3).  This "standard exists only because the [PLRA] requires that inmates exhaust any available administrative remedies as a prerequisite to filing suit under Federal law with respect to the conditions of their confinement."  77 Fed. Reg. at *37109.  Prisons "that exempt sexual abuse allegations from their remedial schemes are exempt from this standard, because their inmates may proceed directly to court."  77 Fed. Reg. at *37109; *see* 28 C.F.R. § 115.52(a) (stating that a prison "shall be exempt from this standard if it does not have administrative procedures to address inmate grievances regarding sexual abuse.").

DPSCS adopted a "Sexual Misconduct–Prohibited" directive that "assigns responsibilities and establishes procedures for reporting, responding to, investigating, processing, and resolving a complaint of sexual misconduct."  J.A. 603.  The directive requires the DPSCS to "ensure that existing efforts and new strategies to prevent, detect, and respond to acts of sexual misconduct comply with applicable federal standards . . . established under the authority of the [PREA]."  J.A. 603.  But DPSCS explicitly exempted PREA claims from its ARP process:

> The Department does not permit the use of an informal resolution process or ARP to resolve complaints of rape, sexual assault, sexual harassment, sexual abuse[,] sexual misconduct, inmate on inmate sexual conduct, or other areas afforded protections by standards established under the authority of the [PREA] and related Department procedures.

6

J.A. 584.

Maryland's definitions of sexual harassment and abuse are consistent with the PREA standards and, as the district court correctly held, Johnson was not required to exhaust his claims against Officer Zimmerman. With regard to Lt. Robinette, however, the district court held that Johnson was required to exhaust his claims because his supervisory and bystander claims, based upon Lt. Robinette's failure to act, do not fall within the PREA definitions of sexual harassment or abuse.

Although Johnson's claims against Lt. Robinette do not fall within the strict definitions of PREA, the DPSCS elected to also exempt "sexual misconduct" claims against a prison official from its ARP process. This term is not defined in PREA, but Maryland defines it to include "[a]ction or the lack of action on the part of an employee that contributed to an incident of sexual misconduct." J.A. 607. Accordingly, Johnson was also unable to file an ARP grievance to resolve his complaint that Lt. Robinette contributed to Officer Zimmerman's sexual harassment and abuse of him by his failure to intervene. The district court therefore erred by concluding that Johnson was required to exhaust his claims against Lt. Robinette.

II.

7

We now turn to Johnson's allegations and the evidence he relies upon to support his constitutional claims, viewing "all facts and reasonable inferences therefrom in the light most favorable" to Johnson. *Davison v. Rose*, 19 F.4th 626, 633 (4th Cir. 2021).[3]

We begin with some background. Shortly before filing this lawsuit, Johnson's cell was searched and he was issued a Notice of Inmate Violation for possessing "jailhouse wine." "Jailhouse wine" is an alcoholic beverage that prison inmates commonly make by fermenting scraps of fruit, vegetables, bread, sugar, and other contraband foodstuffs, and is often referred to by the slang terms "pruno" or "hooch" in the prison environment. *See Hunter v. Ayers*, 336 F.3d 1007, 1008 (9th Cir. 2003) ("Pruno is a fermented drink made by prisoners from scraps of fruit and vegetables."); *United States v. Guzman*, 2022 WL 831646, at *1 (7th Cir., Mar. 21, 2022) (describing a homemade alcoholic beverage in prison as a "bag of pungent fruit slop" referred to by the slang term "hooch") Jailhouse wine was widely produced by inmates at MCTC. *See* J.A. 228 (Johnson's testimony that "[e]verybody – there's a lot of people on the [housing] tier that make wine and all of that.").

---

[3] Johnson was extensively deposed about his allegations on December 15, 2020. On January 12, 2022, Johnson executed a declaration in opposition to the defendants' motion for summary judgment. To the extent that Johnson's declaration does not conflict with his prior testimony, we likewise view his statements therein in the light most favorable to him. *See Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.") (cleaned up).

Prior to the searches at issue here, Johnson had a prison record of inmate violations involving jailhouse wine and fermenting materials. Before he was assigned to Housing Unit 4 at MCTC, Johnson was housed in Unit 6, where he received at least two rule violations related to his use or possession of alcohol. He was cited for drinking alcohol, being intoxicated, and attempting to start a fight in the recreation hall in June 2017. Alcohol was also found in his cell and he received a 15-day cell restriction. Johnson testified that he could not recall how many times jailhouse wine had been found in his cell, but he claimed that it always belonged to his cellmate and that he should not have been cited for the violations. Johnson testified that fermenting materials may have been found in his cell, but claimed "[i]t wasn't mine, except for like one time." J.A. 337.

After Johnson was transferred to Housing Unit 4, he was assigned to work in the cafeteria serving food to the other inmates. It is undisputed that kitchen workers are subject to increased scrutiny due to their access to contraband. According to Johnson, they were "routinely patted down to make sure [they] weren't carrying contraband out of the kitchens." J.A. 348. Four corrections officers would line them up, "shake [them] down," and "[i]f they think you got something on you, they take you in the back and strip search." J.A. 177. Not infrequently, kitchen workers were subjected to additional pat down searches while en route back to the housing unit and again when they returned to their unit. *See* J.A. 174 ("They most certainly will be searching you when you come back [from food service] if they think you got food."). Johnson testified that he was stopped on the compound multiple times by different officers looking for contraband and he admitted that he was found with a sandwich in his shirt pocket during one search.

Relevant to Johnson's specific § 1983 claims, all of the challenged searches were conducted shortly after Johnson returned from his kitchen duties. Each search began essentially the same way and progressed largely in compliance with Johnson's understanding of the prison's cell and strip search procedures. When Johnson returned to his housing unit from the kitchen, Officer Zimmerman informed Johnson and his cellmate that their cell was going to be "searched for alcohol or materials that could be fermented into alcohol." J.A. 350; *see also* J.A. 355 (Johnson's declaration that Officer Zimmerman's "stated basis for searching me and my cell was suspicion of alcohol or fermentable materials"). Officer Zimmerman would call another officer to come to Johnson's cell and Johnson's cellmate was sent to the recreation hall. Johnson was handcuffed outside the door where he could watch the cell search. According to Johnson, this was "normal practice for a cell search of a double cell. Officers do not go inside a cell while a prisoner is inside, except when they do a strip search." J.A. 349. Every strip search was conducted in the privacy of Johnson's cell. Officer Zimmerman would instruct Johnson to disrobe, squat down, and lift up his genitals for a visual inspection—which Johnson testified was also consistent with standard procedures.

The first strip search occurred on or about August 8, 2017. When Johnson returned to the housing tier from the kitchen, Officer Zimmerman performed a pat down search of Johnson. About 20 minutes later, Officer Zimmerman told Johnson that he smelled wine and told Johnson that he was going to perform a cell search and strip search for contraband. Johnson disrobed and complied with the visual strip search. He did not recall Officer Zimmerman touching him during this search.

10

On or about August 15, 2017, Officer Zimmerman again told Johnson that he was going to conduct a cell search and strip search for alcohol and fermenting materials. But this time a disagreement between the two men developed. Johnson testified that Officer Zimmerman "tried to grab" his boxers "quite down low like I had something on the side of" them and said, "Give them here!" J.A. 231. When doing so, Officer Zimmerman "grabbed wrong" and touched "[t]he top part of [Johnson's] posterior," like when "you grab somebody on the back and hold them up on the side." J.A. 231-32. There is no claim Officer Zimmerman touched Johnson's genital area or lower buttocks.

On or about August 22, 2017, Officer Zimmerman again searched Johnson's cell and strip searched him. Johnson testified that, during the visual strip search, Officer Zimmerman "thought [Johnson] had something taped to" his testicles and reached out to remove it, but it was "a lint ball or something." J.A. 239. Johnson did not claim that Officer Zimmerman's action in doing so was aggressive or abusive in nature.

On or about August 29, 2017, Officer Zimmerman told Johnson that he smelled smoke in his cell. Johnson testified that this cell search "took him a little longer. He was looking for tobacco or something. He really thought I had tobacco." J.A. 245. Officer Zimmerman also conducted a visual strip search for contraband. Johnson did not claim that Officer Zimmerman touched him during this search.

On or about September 6, 2017, Officer Zimmerman found two oranges in Johnson's locker. Officer Zimmerman took the oranges and told Johnson that it was because they could be used to make wine. Johnson was written up for possessing

11

fermenting materials, and he agreed to 15 days of cell restriction as punishment. Johnson testified that Officer Zimmerman did not touch him during this strip search.

On or about September 13, 2017, Officer Zimmerman searched Johnson's cell and conducted another visual strip search for contraband. Johnson did not claim that Officer Zimmerman touched him during this search.

During a search that took place on or about September 20, 2017, Officer Zimmerman told Johnson that he was "taking too long" to undress and accused Johnson of hiding contraband in his boxers. J.A. 263. Officer Zimmerman reached out and grabbed the top of Johnson's boxers, which resulted in Officer Zimmerman's thumb being just inside Johnson's boxers and touching the top part of Johnson's hips or upper buttocks. Johnson testified that he "smack[ed]" Officer Zimmerman's hand and then complied with the strip search. J.A. 264.

A more contentious disagreement developed between Officer Zimmerman and Johnson during a search on September 27, 2017. Johnson testified that "[t]his strip search was a little different because I ain't going to do it." J.A. 274. He testified that he was angry because the searches had become "a weekly thing" and that he told the officers, "I'm not doing this shit no more." J.A. 274. When Johnson initially refused to remove his clothes, Officer Zimmerman told Johnson that if he didn't comply with the search, he would be locked up. Officer Zimmerman told him, "[a]ll right, look, man. Just do the strip search and we're going to leave you." J.A. 274. Johnson again moved slowly in removing his clothes, and Officer Zimmerman grabbed for Johnson's boxers. Johnson initially testified that when Officer Zimmerman grabbed his boxers, "he had my whole junk tied up

12

in his hand." J.A. 274. But when asked to be specific about the touching, Johnson testified that Officer Zimmerman's hand came in contact with "the side of [one of his testicles] and the top of [his] penis" through the fabric of the boxers. J.A. 275-76. In his declaration, Johnson stated that he shouted at Officer Zimmerman, pushed his hand away, and Officer Zimmerman "didn't try to grab at [his] genitals again, but continued to behave aggressively." J.A. 354.

The final search occurred on October 3, 2017, and led to the Notice of Inmate Violation for Johnson's possession of contraband alcohol. When Johnson returned from the kitchen, Officer Zimmerman told Johnson that he smelled jailhouse wine coming from his cell. According to Johnson, Officer Zimmerman also thought "there was something like around the lid [of Johnson's boxers] or the bottom of [his] shirt," which had a slit in it. J.A. 285. Johnson testified that Officer Zimmerman was "searching everything. He was looking for drugs." J.A. 286. During this search, Officer Zimmerman attempted to turn the top of the boxers over to inspect the lining, but Johnson testified that he "wouldn't do it. So, he tried to take them like rip them off me." J.A. 285. When he did, Officer Zimmerman again touched the top of Johnson's buttocks with his fingers. Johnson grabbed his boxers and, at some point, they were torn.

During the cell search on the same date, Officer Zimmerman and Lt. Robinette found seven to eight gallons of fermented juice, sugar, and oranges. Johnson was cited for possession of "a controlled dangerous substance, intoxicant, or alcohol in sufficient quantity or packaging materials that suggests an intent to distribute or distribution" (Rule 114) and "possess[ion] or use [of] alcohol without authorization" (Rule 301). J.A. 20. This

13

was Johnson's third violation of Rule 114.  The first time he had been given a warning.

The second time—which followed the September 6 search—Johnson agreed to the 15 days

of cell restriction.

On October 19, 2017, the hearing was held on the violations.  Johnson claimed that

Officer Zimmerman "didn't get nothing out of my cell."  J.A. 293.  The hearing officer

found Johnson's testimony unpersuasive and imposed 60 days of segregation as

punishment.[4]  The Warden affirmed but reduced the segregation time to 20 days.  Johnson

was also reassigned from dietary duties to sanitation duties.

On appeal, Johnson claims that on each of these nine occasions the defendants

violated his constitutional rights under the Fourth and Eighth Amendments and that the

district court erred in granting summary judgment against him.  We disagree.

## III.

Government officials sued in their individual capacities are protected by qualified

immunity if "their conduct does not violate clearly established constitutional or other rights

that a reasonable officer would have known." *Sims v. Labowitz*, 885 F.3d 254, 260 (4th

Cir. 2018).  "Qualified immunity seeks to balance two interests, namely, the need to hold

public officials accountable when they exercise power irresponsibly and the need to shield

officials from harassment, distraction, and liability when they perform their duties

reasonably."  *Id.* (cleaned up).  To avoid dismissal of a claim based upon qualified

immunity, the plaintiff must show (1) that the government official violated a statutory or

---

[4]  A third violation was dismissed.

14

constitutional right, and (2) that the "right was clearly established at the time of the alleged violation." *Id*. Under this two-prong approach, we may address the prongs in whatever order we choose. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"We review de novo district court decisions on motions for summary judgment and qualified immunity." *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023). Summary judgment is appropriate when "'there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The party moving for summary judgment discharges its burden by showing that there is an absence of evidence to support the nonmoving party's case." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (cleaned up). "To create a genuine issue for trial, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Id*. (cleaned up); *see Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

## A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "The

15

overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Sims*, 885 F.3d at 260 (cleaned up). "Therefore, to be constitutional, a search must not be unreasonable." *Amaechi v. West*, 237 F.3d 356, 360 (4th Cir. 2001).

To begin, we take note of general principles that guide our evaluation of sexually invasive searches that are conducted in the prison setting. First, it is well established that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of retained constitutional rights of . . . convicted prisoners." *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). To be sure, inmates "retain an interest in some degree of bodily privacy and integrity." *King v. Rubenstein*, 825 F.3d 206, 215 (4th Cir. 2016). But when addressing these types of constitutional claims, "deference must be given to the officials in charge of the jail unless there is substantial evidence demonstrating their response to the situation is exaggerated." *Florence v. Bd. Of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 330 (2012) (cleaned up).

Second, it can hardly be questioned that sexually invasive searches of inmates present special considerations. This is because "a sexually invasive search constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Sims*, 885 F.3d at 261 (cleaned up). When "a search involves movement of clothing to facilitate the visual inspection of a person's naked body, the search qualifies as a type of sexually invasive search." *Id.* (cleaned up). And "[w]hen the scope of a search exceeds a visual inspection of an individual's naked body, the magnitude of the intrusion is even greater." *Id.*

16

To determine whether a sexually invasive search was constitutionally unreasonable, we apply the balancing test adopted by the Supreme Court in *Bell*. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559. We must "examine the search in its complete context and consider the following factors: (1) the scope of the particular intrusion; (2) the manner in which the search was conducted; (3) the justification for initiating the search; and (4) the place in which the search was performed." *Sims*, 885 F.3d at 261 (citing *Bell*, 441 U.S. at 559).

## 1.

Johnson's primary contention is that Officer Zimmerman must have intended to sexually harass and abuse him because the stated basis for searching his person—to uncover jailhouse wine and fermenting materials—did not justify any of the strip searches. Accordingly, we will begin with this *Bell* factor.

Courts have never underestimated the problems of prison contraband, nor second-guessed correction officials by ranking the dangers of any particular item. On the contrary, we must give special deference to the correctional officials who "have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what [inmates] may carry in on their bodies." *Florence*, 566 U.S. at 322; *see also King*, 825 F.3d at 216 (Corrections officials "have an interest in controlling contraband within the prison for the health and security of the inmates. The Supreme Court has long recognized the need to 'guarantee the safety' of the prison community, administrators, inmates, and

17

visitors alike." (quoting *Hudson v. Palmer*, 468 U.S. 517, 527 (1984)). The "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell*, 441 U.S. at 559. "Weapons, drugs, and alcohol all disrupt the safe operation of a jail." *Florence*, 566 U.S. at 332. "The use of drugs can embolden inmates in aggression toward officers or each other; and, even apart from their use, the trade in these substances can lead to violent confrontations." *Id.* "The competition for such goods begets violence, extortion, and disorder." *Id.* at 333 (cleaned up); *see also West v. Murphy*, 771 F.3d 209, 212 (4th Cir. 2014) ("[C]ontraband poses significant security risks and dangers inside detention facilities. Weapons or other items may be used to attack officers or other arrestees. Arrestees may overdose on drugs, or their intoxication may create additional burdens for officers.").

Moreover, "[c]oncealing [such] contraband often takes little time and effort. . . . Something small might be tucked or taped under an armpit, behind an ear, between the buttocks, in the instep of a foot, or inside the mouth or some other body cavity." *Florence*, 566 U.S. at 333; *see also Bell*, 441 U.S. at 559 (noting documented instances of "inmate attempts to secrete these items into [a] facility by concealing them in body cavities"); *Florence*, 566 U.S. at 335 (noting that in one instance, a detainee had "2 dime bags of weed, 1 pack of rolling papers, 20 matches and 5 sleeping pills taped under his scrotum") (cleaned up).

Accordingly, we have no doubt that strip searches are a necessary tool for corrections officers who are responsible for seeking out such hidden contraband. "[P]rison officials looking for contraband may subject inmates to reasonable strip searches and cavity

18

searches." *Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) (citing *Bell*, 441 U.S. at 560. "Indeed prison security and safety may require frequent searches of an intensely personal nature—and not every such search is properly the subject of a lawsuit." *Id.*

Johnson does not generally dispute the dangers of *some* contraband or the discretion prison officials must be afforded in their quest to intercept it. Rather, he claims that a reasonable jury could find that Officer Zimmerman's strip searches were sexually harassing and abusive because Officer Zimmerman "did not have a legitimate basis for conducting even a single strip search" of him, "[p]articularly given the low stakes" contraband he sought—"i.e., no deadly weapons, dangerous substances, or threats to the immediate safety of prison inmates or staff." Brief of Appellant at 44-45.

Again, courts are ill-equipped to second-guess the expertise of correction officials by ranking the dangers of contraband. But even so, prison wine, and foodstuffs stolen to brew it, are far from "low stakes" contraband. In addition to the aforementioned safety concerns that intoxicated inmates pose for prison officials and other inmates, jailhouse wine presents a deadly threat to the inmates who consume it. According to the Centers for Disease Control and Prevention, "[p]eople who make pruno usually ferment fruit, sugar, water, and other common ingredients for several days in a sealed plastic bag. This method of fermentation provides the right conditions for the bacteria to make the toxin that causes botulism." *Pruno and Botulism*, https://www.cdc.gov/botulism/risk-factors/pruno.html?CDC_AAref_Val=https://www.cdc.gov/botulism/pruno-a-recipe-for-botulism.html#cdc_risk_factors_other_factor-pruno-a-recipe-for-botulism [https://perma.cc/AYE7-W92Y] (last visited June 12, 2024). The toxin "attacks the body's

19

nerves . . . [and] causes difficulty breathing, muscle paralysis, and even death." *Id.* "In several states, people who are incarcerated have gotten botulism from drinking pruno. Many of these people needed to be hospitalized and some had to be put on a ventilator (breathing machine). *Id.*; *see Walker v. Ryan*, 2017 WL 11592196, at *8 (D. Az., Sept. 14, 2017) ("'Pruno,' also known as prison wine, . . . may result in botulism, a potentially fatal paralytic illness. In late November through early December of 2012, the [Arizona prison system] had several inmates come close to death after drinking pruno.").

As a consequence, prisons have adopted policies specifically targeted to eliminate or reduce the production of prison wine. *See e.g., Drummond v. Wolfe*, 2020 WL 5759760, at *7 (D. Md., Sept. 28, 2020) ("The preservation of internal order and discipline constitutes a legitimate goal of the correctional institution. Here, the [Maryland correctional institution] imposes limits on fruit in prisoner's cells due to concerns about the potential for making contraband alcohol.") (cleaned up); *Goodman v. Ryan*, 2018 WL 10195811, at *6 (D. Az., Jan. 10, 2018) ("To minimize the risk of inmates making hooch," the correctional institution "does not permit medium-custody inmates . . . to take food from the chow hall back to their housing areas except for the dinner sack meal, which does not generally include fruit."); *Walker* 2017 WL 11592196, at *8 (noting that, to prevent further cases of botulism, the correctional institution "stopped selling/providing sugar, white bread, and fresh fruit in maximum custody and detention units where inmates eat their meals in their cells").

Also, the fact that only two of the nine searches challenged in this lawsuit resulted in the discovery of contraband does not mean, as Johnson suggests, that the searches were

20

unjustified from the inception and, therefore, were intended to be harassing instead. The fact that a search for contraband yields little to no results "may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises." *Bell*, 441 U.S. at 559; *Crawford*, 796 F.3d at 258 ("Searches that do not uncover contraband may be no less penologically justified than those that do.").

Here, Johnson had a history of alcohol and alcohol-related infractions in prison, and he had been found in possession of fermenting foodstuffs on at least two occasions prior to the discovery of and removal of the oranges from his cell during the challenged September 6 search. As a kitchen worker, Johnson also had unique access to scraps of fermenting foodstuffs and the ability to transport them from the kitchen to his cell. For example, slices of fruit or vegetables, packets of sugar, or scraps of bread or potatoes could be concealed in his genital area or the seams of his clothing. Officer Zimmerman's stated basis for every cell and strip search was to search for contraband and, on nearly every occasion, to search specifically for jailhouse wine or fermenting materials. And every challenged search was conducted shortly after Johnson returned from his kitchen duties to his cell.

Accordingly, we reject Johnson's conclusory assertion that, because jailhouse wine is "low stakes contraband" and only two of the nine searches produced contraband, Officer Zimmerman's searches must have been motivated by a desire to sexually harass and abuse him. The risk to prison security and inmate safety posed by prison wine justified the searches and weighs strongly in favor of reasonableness under the Fourth Amendment.

2.

21

"The question whether a sexually invasive search is conducted in a private or a public setting is especially relevant to this Court's determination of reasonableness." *United States v. Edwards*, 666 F.3d 877, 883 (4th Cir. 2011) (cleaned up).

> We have repeatedly emphasized the necessity of conducting a strip search in private. While every strip search need not be conducted in a private holding cell to adequately safeguard [an inmate's] privacy interests, we consider whether a sexually invasive search could have been viewed by others, and whether it was in fact viewed by others, in our analysis of the reasonableness of the search.

*Id*. According to Johnson's testimony, every strip search was conducted in the privacy of his cell, by a member of the same sex (Officer Zimmerman), and outside the view of any other persons—including Lt. Robinette. Therefore, the location of each strip search also weighs heavily in favor of reasonableness.

### 3.

The final two prongs in our reasonableness inquiry require us to consider "the scope of [any] particular intrusion and the manner in which the search was conducted." *Edwards*, 666 F.3d at 883; *see also Sims*, 885 F.3d at 261 (noting that in some cases, the scope of the search and the manner in which it was performed may "involve overlapping inquiries").

#### i. The Visual-Only Strip Searches

We begin with the visual-only strip searches. According to Johnson's testimony, four of the nine searches involved a visual inspection for contraband only, after Johnson

22

had voluntarily removed his clothing.[5]  There is no claim that Officer Zimmerman touched Johnson during these searches, much less that he touched Johnson in a sexual manner.

Such strip searches have long been recognized as a valid tool that corrections officers may employ to search for contraband and may be utilized without any particularized suspicion.  *See Florence*, 566 U.S. at 327-28 ("[D]eterring the possession of contraband depends in part on the [correction officer's] ability to conduct searches without predictable exceptions."); *Hudson v. Palmer*, 468 U.S. 517, 529 (1984) ("For one to advocate that prison searches must be conducted only pursuant to an enunciated general policy or when suspicion is directed at a particular inmate is to ignore the realities of prison operation") (cleaned up); *Crawford*, 796 F.3d at 258 ("[P]rison security and safety may require frequent searches of an intensely personal nature—and not every such search is properly the subject of a lawsuit.").  Moreover, visual strip searches performed in the course of official duties, even if performed on a weekly basis, would not appear to fall within PREA's definition of sexual abuse.  Therefore, inmate claims that they are being strip-searched too frequently or that such searches for contraband were not justified by reasonable suspicion—as opposed to a claim that they were sexually abused or assaulted within the meaning of the PREA during the strip search—would seem to still fall within the boundaries of the PLRA exhaustion requirement.

---

[5]  These visual-only strip searches occurred on August 8, August 29, September 6 and September 13—the first, fourth, fifth, and sixth searches.

23

Johnson nevertheless argues that we can infer that the strip searches were unreasonable because DPSCS prison policy requires that strip searches be conducted in a strip cage, instead of in a private cell. But the *Bell* factors look to the question of whether the strip search was conducted in a private setting, whether the search was conducted by a member of the same sex, whether it could have been viewed by others, and whether it was otherwise constitutionally reasonable—not whether a particular prison's policy generally requires that they must or should have been conducted in a *different* private setting. Here, we can easily conclude that the scope and manner of the visual strip searches, considered in conjunction with their location and justification, weighs conclusively in favor of reasonableness and, therefore, that the defendants were entitled to summary judgment on these claims.

## ii. The Touchings

This brings us to the strip searches during which Johnson claims that Officer Zimmerman touched his upper buttocks or genitalia. As the district court correctly noted, the fact that an inmate is momentarily, incidentally, or accidentally touched during a strip search does not alone render the search unreasonable. By definition, a strip search "includes the exposure of a person's naked body for the purpose of a visual *or physical* examination," and these searches may include the "movement of clothing to facilitate the visual inspection of a suspect's naked body." *Edwards*, 666 F.3d at 882 (cleaned up). Accordingly "some physical contact is permissible, and indeed [may be] unavoidable." *Id.* at 886 (cleaned up). "Strip searches should be hygienic, and should not be performed in degrading, humiliating, or abusive fashion." *Id.* at 885. And contraband "discovered in

24

the course of a sexually invasive search" may be seized, so long as it is not "seized in a manner that poses an unnecessary risk of harm to the person being searched." *Id.*

We begin with the August 22 search. According to Johnson's testimony, Officer Zimmerman observed a foreign object on Johnson's testicles during the visual strip search, suspected that Johnson may have contraband taped to his testicle, and reached in to remove it. This relatively minor extension of the visual strip search into a momentary and incidental touching to remove suspected contraband did not render the officer's actions constitutionally unreasonable. *See e.g., Florence*, 566 U.S. at 334-335 (noting that contraband "might be tucked or taped under an armpit, behind an ear, between the buttocks, in the instep of a foot, or inside the mouth or some other body cavity," and that, in one instance, the detainee had numerous items of contraband "taped under his scrotum"); *see also Edwards*, 666 F.3d at 885 (Contraband discovered during a strip search may be seized, provided it is not "seized in a manner that poses an unnecessary risk" to the inmate).

Here, there is no testimony that Officer Zimmerman made any sexual comments to Johnson during this or any other search. There is no testimony that Officer Zimmerman "fondled" Johnson's testicle when he removed the foreign object. *See* 34 U.S.C. § 30309(11) (defining "sexual fondling" as "the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification."). And there is no claim that Officer Zimmerman removed the foreign object in an unhygienic, "degrading, humiliating, or abusive manner." *Edwards*, 666 F.3d at 885. Accordingly, Johnson has failed to present sufficient testimony or other evidence upon which a reasonable jury could find that Officer Zimmerman's momentary

and incidental touching of Johnson's testicle to remove the suspected contraband rose to the level of a sexually abusive search under PREA or a constitutionally unreasonable one under the Fourth Amendment.

Johnson argues that the August 15, September 20, and October 3 searches were unreasonable because Officer Zimmerman touched the upper part of his buttocks when he reached out and grabbed his boxers. Again, we hold that no reasonable jury could conclude that these events rose to the level of an unreasonable search.

According to Johnson's testimony, during each of the three searches, Officer Zimmerman suspected that Johnson was secreting contraband in the seams of his shirt or boxers. During the August 15 search, Officer Zimmerman "tried to grab" Johnson's boxers "quite down low like I had something on the side of" them. J.A. 231. Officer Zimmerman also "reach[ed] for [Johnson's] shirt, but "grabbed wrong," and touched the "top part of his posterior." J.A. 231. During the September 20 search, Johnson was taking too long to undress and Officer Zimmerman grabbed the top of Johnson's boxers which resulted in Officer Zimmerman's thumb being just inside Johnson's boxers and touching Johnson's upper buttocks. During the October 3 search, Officer Zimmerman suspected that there was something hidden in Johnson's sweatshirt or boxers and grabbed Johnson's boxers from the back. When he did so, his four fingers were inside the top of Johnson's boxers and his thumb was outside the boxers.

To be sure, Johnson's testimony indicates that these searches may have been conducted in a more aggressive manner. But on each occasion, Officer Zimmerman reached out and grabbed Johnson's boxers or shirt because he suspected that Johnson was

26

concealing small items of contraband in the seams—an act consistent with Officer Zimmerman's performance of his official duties as opposed to an intentional sexual assault within the meaning of the PREA. Again, Johnson presented no testimony that Officer Zimmerman made sexual comments to Johnson or sexually fondled him and no evidence to support his conclusory allegation that these momentary touchings were unrelated to Officer Zimmerman's official duties or sexually motivated in any way.

Accordingly, we hold that the manner and scope of the August 15, September 20, and October 3 searches weigh in favor of reasonableness and that the evidence is insufficient for a reasonable jury to conclude that Officer Zimmerman's momentary touching of Johnson's upper hips or buttocks on these three occasions rose to the level of a sexual assault within the meaning of the PREA or a constitutionally unreasonable search under the Fourth Amendment. The defendants were therefore also entitled to summary judgment as to these claims.

### iii.

This leaves the September 27 search. As described by Johnson, the events that led up to the September 27 touching were similar to those that preceded the August 15, September 20, and October 3 touchings. Johnson had not yet removed his underwear and Officer Zimmerman suspected that Johnson was hiding contraband in his clothing or on his person. This time, however, Johnson outright refused to comply with the strip search. He told Officer Zimmerman that he was "not doing this shit no more." J.A. 274. After his initial refusal to comply, Johnson began removing his clothing very slowly, and Officer Zimmerman reached out to grab Johnson's boxers. When he did so, Officer Zimmerman's

27

hand came into contact—through the fabric of the boxers—with the side of Johnson's genitals and the top of his penis. Johnson shouted at Officer Zimmerman, Officer Zimmerman removed his hand, and there was no further contact.

The reasonableness of this September 27 search is admittedly a closer call. Johnson acknowledges that the search was related to Officer Zimmerman's official duties—he was looking for contraband concealed in Johnson's clothing or on his person—and that he was refusing to comply with Officer Zimmerman's directive that he remove his clothing for the strip search. Johnson has not claimed that Officer Zimmerman made sexually harassing comments about Johnson's body or genitalia, or that he uttered any sexually menacing words when he grabbed the boxers. And there is no claim that Johnson's health or safety was compromised. But, according to Johnson, Officer Zimmerman grabbed his genitals through his boxers during the confrontation in an unreasonably aggressive manner.

In the end, however, we need not decide whether a jury could ultimately conclude that Officer Zimmerman's grabbing of Johnson's genitals on September 27 was an exaggerated response to Johnson's recalcitrance or rose to the level of sexual abuse under the PREA. As we will explain, the defendants are entitled to qualified immunity from this claim (as well as from those discussed above) because the right at issue was not "clearly established" at the time.

iv.

"'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia. v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up). "To

28

be clearly established, a legal principle must have a sufficient clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* (cleaned up).

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity. We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established.

*Id.* at 589-90 (cleaned up); *see also Sims*, 885 F.3d at 262.

Under this second prong of the qualified immunity analysis, we examine whether the preexisting law was so clear that every reasonable official would understand that the strip searches, including those that involved a momentary grabbing or touching of an inmate's genitals or buttocks during an otherwise penologically-justified strip search for contraband, rises to the level of a sexual assault within the meaning of the PREA and, consequently, a violation of the inmate's Fourth Amendment rights. We hold that it was not.

First, the controlling precedents in this circuit have all involved "touchings" that unequivocally satisfied the PREA's definitions of a sexual assault and that were *far* more egregious than the strip searches or touchings that Johnson has claimed that he was subjected to during some of them. *See, e.g., King*, 825 F.3d at 215 (holding that inmate sufficiently alleged an unreasonable search where inmate was subjected to surgery to

29

remove his penile implants, which required cutting "beneath the skin into a sensitive, private body part" and involved "risk, trauma, and pain"); *Edwards*, 666 F.3d at 883-85 (finding search unreasonable where officer used knife to cut away a sandwich baggie containing suspected narcotics that was tied around the suspect's penis; the search was conducted outdoors where it could be observed by others, and in the dark with nothing but a flashlight to illuminate defendant's genitals, all of which placed the suspect in fear of severe physical injury); *Amaechi*, 237 F.3d at 359 (search unreasonable where male police officer arrested female suspect for a noise complaint, paraded her outside handcuffed with her house dress open and exposing her breasts, and then searched her in the view of her neighbors and family; when conducting the search the officer then "stood in front of [the suspect], squeezed her hips, and inside her opened dress, swiped one ungloved hand, palm up, across her bare vagina, at which time the tip of his finger slightly penetrated [the suspect's] genitals" and "put his hand up into [her] butt cheeks"); *Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir. 1981) (finding unreasonable the forceful removal of female inmate's underclothing while male guards restrained her after inmate agreed to cooperate if the male guards would withdraw and allow the female nurse to assist).[6]

---

[6] Our decision in *Sims v. Labowitz*, 885 F.3d 254 (4th Cir. 2018) was issued after the events at issue in this lawsuit and therefore could not have provided guidance to the correctional officers in this case. In any event, our holding in *Sims* that the defendant violated the Fourth Amendment when he ordered a juvenile arrestee to sexually manipulate his penis to achieve an erection in front of others so that officer could photograph it as evidence in support of a sexting charge would not have put the defendants in this case on notice that their conduct was unlawful.

Johnson has also failed to present us with a "consensus of persuasive authority" from other circuits that clearly establishes that the Officer Zimmerman's actions were unconstitutional. *See e.g., Ullery v. Bradley*, 949 F.3d 1282, 1286-87 (10th Cir. 2020) (affirming denial of qualified immunity where officer verbally harassed inmate with overtly sexual comments and threats; demanded that inmate "expose her breasts under threat of reprisal"; repeatedly approached inmate from behind and forcefully pressed his genitals into her buttocks and fondled her breasts; and, on one occasion, backed her up against a wall and "forcefully thrust his hand between her legs and groped her crotch"); *Sconiers*, 946 F.3d at 1259-61 (11th Cir. 2020) (allowing Eighth Amendment claim of excessive force and sexual assault under the PREA to proceed where the defendant-officer pepper-sprayed the shackled inmate in the face and slammed him to the ground, after which he pulled the inmate's pants down and "forcefully penetrated [the inmate's] anus with his finger"); *Harris v. Miller*, 818 F.3d 49, 55 (2d Cir. 2016) (vacating summary judgment on Fourth and Eighth Amendment claims where inmate testified that "three female officers grabbed her, threw her to the ground, lifted her smock, and forcibly opened her legs to allow [a] male officer to visually inspect her genitalia"); *Crawford*, 796 F.3d at 254 (concluding that inmate stated a claim for sexual abuse where the officer, during a search, "paused around [the inmate's] crotch, 'grabbed' and 'held' his penis and asked 'what's that?'" and then "continued to 'squeeze' and 'fondle' the area around [the inmate's] penis and 'roam' his hands down [the inmate's] thigh"); *id.* (holding that second inmate stated an Eighth Amendment claim for sexual abuse where the officer informed the inmate that "he was going to make sure [the inmate] did not have an erection" and then "paused to fondle

31

and squeeze his penis"); *Hively*, 695 F.3d at 642 (reversing summary judgment on excessive force/sexual abuse claim where plaintiff claimed that prison "guard spent five to seven seconds gratuitously fondling the plaintiff's testicles and penis through the plaintiff's clothing and then while strip searching him fondled his nude testicles for two or three seconds."). And, as we have pointed out, the PREA descriptions of what might rise to the level of an unconstitutional sexual assault also do not fairly encompass Johnson's description of Officer Zimmerman's actions. *See* 34 U.S.C. § 30309(9)(A), (11); 28 C.F.R. § 115.6.

Having surveyed the caselaw from the Supreme Court and this court, and considered the opinions of our sister circuits for a consensus of persuasive authority, we conclude that a reasonable corrections officer would not have known that any of the strip searches, including the two that involved the momentary touchings of Johnson's genitalia, would rise to the level of an unreasonable search under the Fourth Amendment.

## B.

Johnson also appeals the district court's grant of summary judgment to the defendants on his Eighth Amendment claim. The Eighth Amendment guarantees inmates the right to be free from "cruel and unusual punishments" U.S. Const. amend. VIII. It "protects inmates from inhumane treatment and conditions," *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008). Accordingly, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of

32

physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10.

"Sexual abuse has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society. Nor does it comport with contemporary standards of decency." *Sconiers v. Lockhart*, 946 F.3d 1256, 1259 (11th Cir. 2020) (cleaned up). "A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or to humiliate the inmate, violates the Eighth Amendment." *Crawford*, 796 F.3d at 257; *see also Washington v. Hively*, 695 F.3d 641, 643 (7th Cir. 2012) ("An unwanted touching of a person's private parts, intended to humiliate the victim or gratify the assailant's sexual desires, can violate a prisoner's constitutional rights whether or not the force exerted by the assailant is significant."). "And even if contact between an officer and an inmate's genitalia was initially justified, if the officer finds no contraband, continued sexual contact may be actionable." *Crawford*, 796 F.3d at 257.

The PREA standards are in accord. Sexual abuse of an inmate by a corrections official does not encompass every touching of even intensely private body parts, even momentary or incidental touchings that occur when force is applied in connection with the corrections officer's performance of his official duties. *See* 28 C.F.R. § 115.6 ("Sexual abuse of an inmate. . . by a staff member. . . includes . . . *intentional* contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is *unrelated* to official duties or where the staff member . . . has the *intent* to

33

abuse, arouse, or gratify sexual desire.) (emphasis added). Thus, a corrections officer's *intentional* contact with an inmate's private areas that is *not* associated with a search conducted pursuant to his or her official duties may rise to the level of a constitutional violation. But a corrections officer's intentional contact with an inmate's private areas that occurs during a pat down or strip search only rises to the level of sexual abuse if the inmate can produce sufficient evidence to prove that the corrections officer had the requisite malicious intent to sexually abuse the inmate, sexually arouse the inmate or himself, or otherwise gratify sexual desire. Momentary and incidental contact with such areas, or accidental contact that occurs during the course of an official search, cannot satisfy the inmate's burden.

As discussed in more detail above, Johnson's testimony about Officer Zimmerman's actions falls well short of describing actions that rise to the level of a sexual assault that is "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 10 (cleaned up). Accordingly, we agree with the district court's conclusion that no reasonable jury could find that Officer Zimmerman touched Johnson "with the intent to gratify the officer's sexual desire or humiliate the inmate," *Crawford*, 796 F.3d at 257, or that he acted "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Brooks v. Johnson*, 924 F.3d 104, 113 (4th Cir. 2019). Nor has Johnson pointed us to any clearly established law that would have that placed a reasonable official on notice that his conduct was unlawful. *See Wesby*, 138 S.

34

Ct. at 589. Accordingly, we affirm the district court's decision to grant summary judgment on this claim as well.[7]

C.

Finally, even if we were to conclude that Officer Zimmerman violated Johnson's clearly established constitutional rights, Lt. Robinette would be independently entitled to summary judgment on Johnson's claims against him for supervisory and bystander liability.

Johnson admits that Lt. Robinette never strip searched him or touched him during a strip search. Lt. Robinette was never present inside his cell during any of the strip searches, nor did he ever "personally order, instruct, or request that [Johnson] remove [his] clothes to be strip searched." J.A. 86. Instead, Johnson claims that Lt. Robinette can be held liable because he would have been able to see Officer Zimmerman order Johnson to go into the cell with him from anywhere on the tier for the purpose of performing a strip search.

---

[7] We need pause only briefly to address Johnson's allegation that Officer Zimmerman sexually harassed him within the meaning of the PREA. In his amended complaint, Johnson alleged that Officer Zimmerman "sexually assaulted [him] by inappropriately and gratuitously touching [his] naked buttocks and scrotum, *and* by making comments of a sexual nature, including but not limited to comments regarding [his] genitalia." J.A. 67 (emphasis added). But despite extensive questioning at his deposition and his submission of a post-deposition declaration, Johnson provided no evidence to support his allegation that Officer Zimmerman ever made "demeaning references to [his] gender, sexually suggestive or derogatory comments about [his] body or clothing or obscene language or gestures." 28 C.F.R. § 115.6. On the contrary, when specifically asked what, if any, comments Officer Zimmerman made to him of a sexual nature, Johnson replied that Officer Zimmerman told him that that "[t]his is my house. If I want to strip search, I can strip search. I'm the boss." J.A. 334-35. These statements do not fall within the PREA definition of "sexual harassment," nor do they otherwise rise to the level of "cruel or unusual punishment" violative of the Eighth Amendment. Accordingly, to the extent Johnson purports to appeal the district court's grant of summary judgment on his sexual harassment claim, we affirm this ruling as well.

35

"[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). To establish supervisory liability, the inmate must prove:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* at 799 (cleaned up).

Bystander liability is premised on an officer's "affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers." *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002) (cleaned up). "[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.* at 204. The "bystanding officer must know of his fellow officer's misconduct. . . . If the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible." *Id.* at 204 n.24.

Johnson's evidence falls far short of that necessary to establish supervisory or bystander liability against Lt. Robinette. As the district court observed, Johnson failed to forecast evidence sufficient to prove Lt. Robinette knew or should have known that Officer Zimmerman was engaged in unconstitutional acts of sexual abuse or that he had a

36

propensity for engaging in such unlawful action. At most, Johnson testified that Lt. Robinette was in the vicinity of Johnson's cell during some of Officer Zimmerman's strip searches for contraband and, therefore, should have known that Officer Zimmerman was strip searching him. But, at no point was Lt. Robinette present in the cell during any strip search. Even if Johnson's testimony is sufficient to establish that Lt. Robinette was or should have been aware that Officer Zimmerman was conducting some of the strip searches for contraband, the evidence wholly fails to support a finding that Lt. Robinette was aware of a pervasive and unreasonable risk of constitutional injury to Johnson, that he knew or should have known that Officer Zimmerman's contact with Johnson at any point exceeded the proper performance of his official duties, or that he had a reasonable opportunity to prevent Officer Zimmerman from touching Johnson during the searches. Accordingly, we affirm the district court's grant of summary judgment to Lt. Robinette on this basis.

## IV.

For the foregoing reasons, although we conclude that the district court erred by dismissing of Johnson's claims against Lt. Robinette for failure to exhaust under the PLRA, we affirm the district court's grant of summary judgment in favor of the defendants on Johnson's statutory and constitutional claims.

*AFFIRMED*

37